# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| JAMAL KEMO SAUNDERS, <br><br> *Plaintiff,* <br><br> v. <br><br> CARL A. MANIS, *et al.*, <br><br> *Defendants.* | CASE NO. 7:18-cv-00045 <br><br> **MEMORANDUM OPINION** <br><br><br> JUDGE NORMAN K. MOON |

Before the Court is a motion for summary judgment filed by Defendants Hughes[1] and Matthew Roberts. Dkt. 65. Plaintiff Jamal Kemo Saunders, a Virginia inmate proceeding *pro se*, brought this action against Hughes, Roberts, and others alleging violations of his constitutional rights under the Eighth and Fourteenth Amendments. Dkt. 1. All Defendants but Hughes and Roberts have since been dismissed from the action. Dkt. 68. Hughes and Roberts now seek summary judgment on the grounds that Plaintiff failed to exhaust available administrative remedies prior to initiating this action. Dkt. 65. Because the Court agrees that Plaintiff failed to exhaust administrative remedies as required, Defendants' motion will be granted and Plaintiff's suit shall be dismissed without prejudice.

## Background

Plaintiff's complaint alleges a multitude of wrongdoing by several actors in Virginia's prison system, but with respect to the two remaining Defendants, Hughes and Roberts, only Plaintiff's retaliation claims remain relevant.

---

[1] The first names of many Defendants in this action have been withheld.

Retaliation related to sexual assault reporting

Plaintiff alleges that on November 27, 2017, while incarcerated at Wallens Ridge State Prison ("Wallens Ridge"), Plaintiff was sexually assaulted by Defendant Mullins during a prostate exam that took place in the medical department at Wallens Ridge. Dkt. 1 ¶¶ 55–66. Plaintiff alleges that he reported this sexual assault by filing an emergency grievance and by calling the Prison Rape Elimination Act ("PREA") hotline on December 6, 2017. *Id.* at 67. Plaintiff says his grievance was "determined an emergency" the following day and referred to "institutional investigators." *Id.* ¶ 68. On December 10, 2017, Hughes and Roberts "called Plaintiff in their office and threatened to kill Plaintiff if he did not stop cooperating in the allegations Plaintiff made against Defendant Mullins." Dkt. 1 ¶ 84. Plaintiff called the PREA hotline to report this alleged retaliation by Hughes and Roberts that same day. *Id.* ¶ 85.

On December 28, 2017, Hughes and Roberts again allegedly threatened Plaintiff's life in retaliation of him reporting the sexual assault. This time, Roberts and Hughes allegedly walked Plaintiff into a staff office near a pod of "top tier offenders," accosted Plaintiff with threats and slurs, then stepped out into the pod where the inmates were congregated and stated: "this bitch in the office, Saunders, is a snitch and is trying to fuck up Dr. Mullins family [sic] by saying [Dr. Mullins] stuck his finger in [Plaintiff's] asshole. Somebody need to [sic] fuck him up for me and I got them (payment)." *Id.* ¶¶ 86–90.

Plaintiff alleges that he reported this retaliation by Hughes and Roberts in several ways. First, Plaintiff states that on December 28, 2017, he called the PREA hotline to report the retaliation of Hughes and Roberts. *Id.* ¶ 94. On an unspecified date, Plaintiff said that he "attempted to file an Emergency Grievance, but floor officers stated they couldn't accept or sign the grievance for processing because defendant Hughes ordered them not to take no more

grievances from Plaintiff." *Id.* ¶ 97 (citing Dkt. 1-35).[2] On January 3, 2017, Plaintiff alleges that he apprised his mother, Delma Jamison, of these threats over a phone call, and that she in turn called "Regional Administrator Paton" and "Major Anderson" of Wallens Ridge to report the complaints, but that her entreaties for help were rejected by the officials. *Id.*

On January 4, 2018, Plaintiff alleges that he "filed a compliant [sic] and request for help" to the special investigation unit at Wallens Ridge, the American Correctional Association, and several senior officials at Wallens Ridge. *Id.* ¶ 103; Dkt. 1-32. The document appears to be a letter sent to various parties—including Rep. Bobby Scott (Va-03) and Department of Justice attorneys—as well as Warden Manis. Dkt. 1-32. The letter states that it "is a memorandum in an attempt to report and exhaust the Administrative Remedies within the Department of Corrections and its associates to seek appropriate relief … ." *Id.* at 2. The letter then provides a detailed account of the above-relayed facts. *Id.* Plaintiff alleges that he could find no further administrative remedy he could realistically exhaust before he would be "seriously injured or killed." Dkt. 1 ¶ 109.

Under a section of the complaint titled "Exhaustion of Legal Remedies," Plaintiff provides that he "filed Grievances" on Hughes, Roberts, and others on November 28, 2017, for "retaliation and threats." *Id.* ¶ 123 (citing Dkt. 1-34, 1-35). The exhibits referenced in this allegation are emergency grievances filed by Plaintiff. Dkt. 1-34, 1-35. One recevied a response on December 10, 2017, and on the other, as discussed above, Plaintiff wrote "staff refused to accept by staff per L.T. Hughes and Sgt. Roberts orders." *Id.*

---

[2] Exhibit 35 of Plaintiff's complaint appears to be the emergency grievance allegedly rejected improperly by prison staff. It is dated December 27, 2019. Dkt. 1-35.

### Further retaliation by Hughes

Plaintiff alleges that during this same time period, he was advocating on behalf of himself and other inmates for more recreation time, and for greater transparency and consistency by guards in denying recreation time to inmates. Dkt. 1 ¶¶ 99–100. On January 3, 2018, in response to this advocacy and his aforementioned sexual assault reporting, Hughes and former Defendant Porsche, another Wallens Ridge guard, "both threatened to 'cut and kill' Plaintiff when 'his celly is gone and make it look like a fucking suicide." *Id.* ¶ 101. With Plaintiff in the room, the two guards called former Defendant Stallard, a Wallens Ridge inmate, and "told the other offender to 'spread the word Plaintiff is an ATF informant and needed to be killed.'" *Id.* ¶ 102. Because Plaintiff had in fact been an ATF informant, he took this threat particularly seriously. Plaintiff states that he reported this incident to the PREA hotline that day. *Id.*

### Other exhaustion attempts

Defendants state that Plaintiff also submitted two regular grievances regarding this alleged retaliation by Hughes and Roberts. First, on January 22, 2018, Plaintiff filed a regular grievance stating that Warden Manis failed to investigate his sexual assault complaints and that he had been retaliated against by Hughes and Roberts for pursuing these complaints. Dkt. 66 at 3. According to Defendants, this complaint was rejected at intake because the grievance "specifically requested that the 'informal complaint and this grievance be returned to the Warden (Manis) for intake and the opportunity to informally resolve the complaint against him,'" and so prison officials interpreted this as a Request for Services rather than a grievable injury. Dkt. 66 at 3 (citing Dkt. 66-1).

Second, on March 15, 2018, Plaintiff filed another regular grievance in which he complained of retaliation by Hughes and Roberts, among other issues. Dkt. 66 at 3. However, this

came over a month after initiating the present action, and in any event, it was rejected for insufficient information and Plaintiff pursued it no further. *Id.* at 3. Separate from these two regular grievances identified by Defendants, Plaintiff alleges that he filed a third regular grievance on June 14, 2018, nearly six months after initiating the present suit, complaining of retaliation by Hughes. Dkt. 72-11. Plaintiff states that this final grievance served to exhaust his administrative remedies as of June 26, 2018, when "his grievance appeal to level II was upheld/denied." Dkt. 72 at 8 (citing Dkt. 72-11).

### Procedural history

Plaintiff initiated the present suit on January 31, 2018. Dkt. 1. On April 17, 2019, Defendants Hughes, Roberts, Porsche, and Harris submitted a motion for summary judgment based on Plaintiff's alleged failure to exhaust. Dkt. 65. Shortly thereafter, the Court granted Plaintiff's motion to voluntarily dismiss several Defendants from the action, leaving only Hughes and Roberts. Dkt. 68. Plaintiff submitted his opposition to Defendants' motion on May 9, 2019, to which Defendants did not reply. Dkt. 72. The motion is ripe for disposition.

**Legal Standard**

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). If, however,

the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). A plaintiff may not amend a complaint through argument in a brief opposing summary judgment. *Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009).

**Exhaustion**

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA and ... unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). "'[T]he language of section 1997e(a) clearly contemplates exhaustion *prior* to the commencement of the action as an indispensable requirement, thus requiring an outright dismissal [of unexhausted claims] rather than issuing continuances so that exhaustion may occur.'" *Carpenter v. Hercules*, No. 3:10-cv-241, 2012 WL 1895996, at *4 (E.D. Va. May 23, 2012) (quoting *Johnson v. Jones*, 340 F.3d 624, 628 (8th Cir. 2003)). The exhaustion requirement "allow[s] a prison to address complaints about the program it administers before being subjected to suit, reduc[es] litigation to the extent complaints are satisfactorily resolved, and improve[s] litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219.

A prison official has the burden to prove an inmate's failure to exhaust available administrative remedies. *Jones*, 549 U.S. at 216. An inmate's failure to follow the required procedures of the prison's administrative remedy process, including time limits, or to exhaust all levels of administrative review is not "proper exhaustion" and will bar the claim. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). However, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). "[W]hen prison officials prevent inmates from using the administrative process ... the process that exists on paper becomes unavailable in reality." *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the inmate to show, by a preponderance of the evidence, that exhaustion occurred or administrative remedies were unavailable through no fault of the inmate. *See, e.g.*, *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011).

VDOC Operating Procedure ("OP") § 866.1, Offender Grievance Procedure, is the mechanism used to resolve inmate complaints. It requires that, before submitting a formal grievance (also known as a "regular grievance"), the inmate must demonstrate that he has made a good faith effort to resolve the grievance informally through the procedures available at the institution to secure institutional services or resolve complaints. If the informal resolution effort fails, the inmate must initiate a regular grievance by filling out the appropriate form. Prior to reviewing the substantive claims of the grievance, prison officials conduct an "intake" review of the grievance to ensure that it meets the published criteria for acceptance. If the grievance does not meet the criteria for acceptance, prison officials complete the "intake" section of the grievance and return it to the inmate. The inmate may seek review of the intake decision by sending the grievance

form to the Regional Ombudsman. On the other hand, if the grievance meets the criteria for acceptance, it is logged on the day it is received.

There are three levels of review for an accepted regular grievance. The Facility Unit Head of the facility in which the inmate is confined is responsible for Level I review. A dissatisfied inmate may appeal to Level II, which is conducted by the Regional Administrator, the Health Services Director, or the Chief of Operations for Offender Management Services. The Level II response informs the offender whether he may pursue an appeal to Level III, which is the final level of review.

Evidence provided by both Plaintiff and Defendants demonstrates that nearly all grievances filed by Plaintiff prior to initiating the present suit were emergency grievances, not regular grievances. Dkt. 66 at 5 (citing Dkt. 1-34, 1-35). Defendants argue that this distinction matters because while grievances are "processed through the administrative grievance process," an emergency grievance can be accepted and immediately responded to by a staff member. Dkt. 66 at 5. *See* OP 866.1(IV)(O). An emergency grievance does not suffice for exhaustion purposes under the OP, which states in pertinent part:

> An offender meets the exhaustion of remedies requirement only when a Regular Grievance has been carried through the highest eligible level of appeal without satisfactory resolution of the issue. ... Submission of an Emergency Grievance does not satisfy the exhaustion of remedies requirement; the offender must submit the issue on a Regular Grievance if not satisfied with the Emergency Grievance response. The exhaustion of remedies requirement will be met only when the Regular Grievance has been appealed through the highest eligible level without satisfactory resolution of the issue.

OP 866.1. Furthermore, the filing of an emergency grievance would not make the regular grievance process unavailable or otherwise preclude an inmate from seeking informal resolution, filing a regular grievance, or appealing an unfavorable disposition through available levels of review. This distinction is consistent with the respective purposes of regular grievances and

emergency grievances. *See* OP 866.1(VII). An emergency grievance is designed to elicit lower-level prison staff's response within eight hours to remedy an immediate risk of serious personal injury or irreparable harm. *Id.* Particularly important for exhaustion purposes, an emergency grievance is not processed or appealed in a way that would provide notice to administrative staff, like a warden, regional administrator, or a deputy director, which is an objective of OP 866.1.

The three regular grievances submitted by Plaintiff do not satisfy exhaustion requirements either. The first of these was rejected at intake and thus cannot be said to satisfy exhaustion requirements. Dkt. 66 at 3; OP 866.1(VI)(B). It appears that perhaps this grievance was erroneously interpreted as a Request for Service, but it makes no difference here. OP 866.1(VI)(B)(5) provides: "If an offender wishes a review of the intake decision on any grievance, they may send the Regular Grievance form within five calendar days of receipt to the appropriate Regional Ombudsman for a determination." There is no indication Plaintiff appealed this intake decision.

The other two grievances—submitted on March 15[3] and June 14, 2018—fail because Plaintiff did not file them until after initiating the present complaint on January 31, 2018. Administrative exhaustion is premised on the idea that inmates and officials should seek to resolve issues prior to initiating an action, and so administrative remedies sought after the complaint is filed are irrelevant. *Jones*, 549 U.S. 199, 202 (2007) ("the PLRA … requires prisoners to exhaust prison grievance procedures before filing suit"). Because of this, Plaintiff cannot demonstrate exhaustion based on steps he took months after the complaint was filed.

---

[3] Even if this grievance had been submitted prior to the complaint, it would still have failed for exhaustion purposes. A grievance staff member returned it to Plaintiff on March 28, 2018, requesting that Plaintiff provide more information (specifically, "How you are being retaliated against, etc.") within five days. Dkt. 66 at 3. Plaintiff did not provide further information. *Id.*

Plaintiff claims in his complaint that part of his exhaustion attempts were frustrated by prison officials, because, on an unspecified date, he "attempted to file an Emergency Grievance, but floor officers stated they couldn't accept or sign the grievance for processing because defendant Hughes ordered them not to take no more grievances from Plaintiff." Dkt. 1 ¶ 97; Dkt. 1-35 (alleged emergency grievance, dated December 29, 2017); *Kaba*, 458 F.3d at 684 ("[W]hen prison officials prevent inmates from using the administrative process ... the process that exists on paper becomes unavailable in reality."). However, Plaintiff claims he was attempting to submit an emergency grievance, not a regular grievance. Dkt. 1 ¶ 97. As discussed above, whether or not this form was improperly rejected at intake, it would have been ineffective to exhaust Plaintiff's administrative remedies here. OP 866.1(VII). Thus, this complaint does not excuse his failure to exhaust.

Finally, the Court also recognizes that Plaintiff may have genuinely feared for his life when foregoing administrative exhaustion, but there were more appropriate options for Plaintiff rather than prematurely filing a section 1983 complaint seeking compensatory and injunctive relief. Dkt. 1 at 18–19; *see Horton v. Kopp*, No. CV PWG-16-3086, 2018 WL 1243537, at *7 (D. Md. Mar. 9, 2018) (dismissing for failure to exhaust when Plaintiff initiated the complaint "in fear for his life, while continuing to exhaust his administrative remedies with the state of Maryland"); *Robinson v. Sowell*, No. 516-cv-01876JMCKDW, 2016 WL 3769766, at *2 (D.S.C. June 21, 2016) ("Plaintiff's assertion that he did not exhaust because his situation is an emergency does not excuse the lack of exhaustion"). In fact, Plaintiff availed himself of several such options, including the emergency grievance procedure on several occasions.[4]

---

[4] These alternative efforts by Plaintiff also included filing for a Temporary Restraining Order in a separate action to enjoin Defendants' retaliation, which Plaintiff later voluntarily dismissed. *Saunders v. Kiser, et al.*, No. 7:18-cv-00012 (W.D. Va.).

In sum, Plaintiff has failed to exhaust the administrative remedies available to him at Wallens Ridge prior to initiating this suit. Emergency grievances do not suffice for exhaustion purposes, and the only regular grievance Plaintiff filed prior to initiating the suit was rejected at intake. Regular grievances filed after initiating a suit cannot cure Plaintiff's exhaustion shortcomings, nor can his claims of exigency.

**Conclusion**

For the foregoing reasons, Defendants have demonstrated that Plaintiff failed to exhaust administrative remedies available to him prior to initiating this action, and so their motion for summary judgment shall be granted. An appropriate order shall issue.

Entered this __14th__ day of April, 2020.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE